[Cite as *In re A.P.*, 2021-Ohio-2238.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| IN THE MATTER OF: | JUDGES:<br>Hon. William B. Hoffman, P. J.<br>Hon. John W. Wise, J. |
| A.P., H.P., and L.P. | Hon. Earle E. Wise, Jr., J. |
| Adjudged Dependent and<br>Abused Children | Case Nos. 2021 CA 0002, 2021 CA<br>0004  and 2021 CA 0005 |
| | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Court of Common Pleas,
Juvenile Division, Case Nos. 21930069,
21930070 and 21930071

JUDGMENT:                              Affirmed

DATE OF JUDGMENT ENTRY:       June 29, 2021

APPEARANCES:

For Appellant Father                 For Appellee CCJFS

FREDERICK A. SEALOVER          SARA R. CHISNELL
Post Office Box 2910                 Coshocton County JFS
Zanesville, Ohio  43702             725 Pine Street
                                              Coshocton, Ohio  43812

*Wise, John, J.*

**{¶1}** Appellant-Father G.P. appeals from the January 5, 2021, Judgment Entry of the Coshocton County Court of Common Pleas, Juvenile Division, terminating parental rights and granting permanent custody of their minor children A.P., H.P., and L.P. to Coshocton County Job and Family Services.

STATEMENT OF THE FACTS AND CASE

**{¶2}** G.P. ("Appellant-Father") and C.P. ("Mother") are the parents of A.P. (DOB July 25, 2011), H.P. (DOB April 18, 2014), and L.P. (DOB August 30, 2016).

**{¶3}** On August 5, 2019, Coshocton County Job and Family Services ("the Agency") made a request for an *ex parte* order of temporary custody of A.P., H.P., and L.P. to the Agency, which was granted that same date.

**{¶4}** On August 6, 2019, the Temporary Order of Custody issued pursuant to the *ex parte* order was confirmed at the Shelter Care hearing. Both Appellant-Father and Mother appeared at that hearing.

**{¶5}** On August 6, 2019, the Agency filed its Complaint alleging that A.P., H.P., and L.P. were abused, neglected, and dependent children, primarily due to sexual abuse, physical abuse, emotional mistreatment, and the lack of adequate and stable housing. The Agency requested and was granted pre-dispositional orders that mirrored the *ex parte* orders.

**{¶6}** On October 24, 2019, an adjudicatory hearing was held wherein the trial court made a finding that A.P., H.P., and L.P. were dependent and abused children, based upon admissions made by Mother and Appellant-Father. The dispositional hearing was

continued due to motions filed by foster parents, and all prior orders were continued in the interim.

**{¶7}** On February 28, 2020, the continued dispositional hearing was held. Mother was present at said hearing. Appellant-Father did not appear. After reviewing evidence, the trial court continued the order of temporary custody to the Agency. Mother and Appellant-Father were ordered to comply with the terms of the case plan file stamped September 4, 2019.

**{¶8}** On July 6, 2020, the Agency filed a motion for permanent custody.

**{¶9}** On August 11, 2020, a preliminary hearing was held.

**{¶10}** On August 12, 2020, Mother filed a motion for a six-month extension, and Appellant- Father followed suit with the same on August 13, 2020.

**{¶11}** A hearing on the motion for permanent custody was held on October 13 and 15, 2020.

**{¶12}** At said hearing, the trial court heard testimony from JFS caseworkers Kaylee Shalosky, Denise Nelson, Abby King and Erin Heard, Dr. Gary Wolfgang, foster parents David Wolf and Cinton Rossell, Allwell Behavioral Health therapist Jennifer Raush, Mother C.P. and Appellant-Father G.P.

**{¶13}** Kaylee Shalosky, former Caseworker for Coshocton County Job and Family Services ("the Agency") testified that she first became involved with A.P., H.P., and L.P. on July 22, 2019 when the Agency received reports of physical abuse which was supported by bruising on H.P. (T. at 18).

**{¶14}** Caseworker Shalosky stated that after several unsuccessful attempts to see Appellant-Father's home and his dishonest reports about who he was living with, she went

to the home. (T. at 19-20).  She testified that there was no running water in the home and that there were issues with bed bugs and fleas. (*Id.*)

**{¶15}** Caseworker Denise Nelson testified the she first investigated allegations of sexual abuse on July 26, 2019.  She stated that during an interview with the children, A.P. and H.P. disclosed abuse committed on them by Mother's boyfriend Justin. (T. at 41-46).

**{¶16}** On July 30, 2019, more allegations arose. (T. at 46).

**{¶17}** On August 5, 2019, Caseworker Nelson then conducted another interview with the children. (T. at 46). During said interview, A.P. disclosed that in the home where he stayed with his Father, they were made to eat dog feces, and that Brian W. (the husband of Father's girlfriend) and his Father would hit him in his privates. (*Id.*) Caseworker Nelson testified that A.P. disclosed he witnessed his Father and Brian W. sexually abuse his sisters causing the girls to cry, and that he would try to defend them. (T. at 49).  A.P. was seven years old at the time.

**{¶18}** Caseworker Nelson also interviewed H.P., who reported her Father would lay in bed with her and masturbate and/or penetrate her with his fingers or penis. (T. at 50). She also described "wet stuff' coming out of his penis when he would masturbate. (*Id.*) H.P was five years old at the time. Caseworker Nelson further testified that she found the children were very believable, and that they disclosed things that children at their young ages should not have known. (T at 51).

**{¶19}** Caseworker Erin Heard took over the case from Caseworker King and had the case through the permanent custody filing and hearing. Caseworker Heard testified that the children have continued to disclose more facts and their stories have remained consistent for over a year. (T. at 236).

**{¶20}** Caseworker Heard further testified that Father had minimal compliance with his case plan, at best. (T. at 237). He had not started parenting classes, allegedly only had an appointment for mental health counseling, had not fully cooperated with law enforcement with regards to the abuse investigation, and had not kept the Agency notified with changes in employment or contact information. (*Id.*) While he did complete an assessment with Dr. Wolfgang, he did not follow through with any recommendations. (*Id.*)

**{¶21}** She further testified that the children have also been consistent in their wishes and quite clear that they do not want to return to their parents. A.P. has expressed on several occasions to his foster parents that he wants to live with them and has even begun using their last name on his own accord. (T. at 214). He has also been concerned that he would be forced to go back to his parents. (*Id.*) Both of the girls, H.P and L.P., have expressed to their foster parents, the Rossells, that they wish to live with them. (T. at 229). The children have also expressed to Caseworker Heard that they wish to live with their respective foster parents. (T. at 250, 257).

**{¶22}** The children made further disclosures about the abuse they suffered to their foster parents. David Wolf, A.P.'s foster parent, testified that when A.P. was first placed with them, he had over 80 bruises on his body and a red handprint on his buttocks, which he told the Wolfs was because "Daddy got mad yesterday." (T. at 208). A.P. also had a ligature mark on his wrist and when asked, he informed the foster parents that Appellant-Father had tied a belt around his wrist. (*Id.*) A.P. told the Wolfs that his Father and his Father's girlfriend Hattie would pull on his testicles. (*Id.*) Mr. Wolf testified that A.P. told him that Appellant-Father would make him eat animal feces and called him "dumb and stupid." (T. at 209). A.P. reported to the Wolfs that Appellant-Father once punched him in

the head so hard he went to sleep, that his Father made him take a puff off a cigarette, and that Appellant-Father and Hattie would ask him to masturbate in front of others, and that Appellant-Father, Hattie, and her husband Brian would throw beer cans at him. (T. at 210-212).

**{¶23}** Clinton Rossell, foster parent of L.P. and H.P., testified that L.P. reported to them that Appellant-Father and Hattie penetrated her digitally and hurt her. (T. at 228). Both H.P. and L.P. had rashes on their inner thighs when they came into the Rossell's custody, and H.P. reported that Appellant-Father caused it. (*Id.*) The girls were scared and asked for assurances of protection in the Rossell home. (*Id.*)

**{¶24}** In September 2019, Appellant-Father reported to Caseworker Shalosky that he would be moving out of state to Texas. (T. at 29.) Caseworker Shalosky informed him this wasn't appropriate for working reunification with his children. (*Id.*) She also testified that in her communications with him, he showed no interest in his children, that he was not attending visitation with his children, and that he never asked about his children. (*Id.*)

**{¶25}** Caseworker Abby King testified that Appellant-Father reported to her in October, 2019, that he was moving to Texas. She stated that he did not meet with her until he came into the Agency well after his return to Ohio on January 22, 2020. (T. at 78-79). She testified that Appellant-Father's engagement with the Agency upon his return was inconsistent at best, and that he never asked about his children. (T. at 79-80). Appellant-Father then moved out of the area again to Greenville, Ohio. (T. at 82). Appellant-Father also failed to fully comply with law enforcement in his sexual abuse investigation.

**{¶26}** Caseworker King also testified regarding Mother. Ms. King stated that Mother remained in Coshocton, Ohio, until approximately January 2020. In the fall of 2019, she engaged in a visit with the children, but she brought along Uncle Jay, a person alleged to have abused A.P. while in Mother's care. Subsequent visits were scheduled but she missed in November, 2019, due to her illness, and on another scheduled visit she neither called nor showed. She had no other contact with the children during the pendency of this case. Ms. King's next contact with Mother was via text message received in late December/early January, 2020, advising that she and her fiancé, also alleged to have perpetrated acts of abuse and neglect towards the children, moved to Greenville, Ohio. Thereafter, Mother had no contact with the children and made no progress on her case plan, although she did appear at the Dispositional Hearing on February 28, 2020.

**{¶27}** On January 31, 2020, Appellant-Father, in accordance with his case plan, completed an assessment with Dr. Gary Wolfgang. (T. at 124). Dr. Wolfgang testified that Appellant-Father significantly diminished and minimized the allegations against him. (T. at 130). Dr. Wolfgang testified he believed that Appellant-Father needed treatment, extensively if any of the reports from the children were valid, and aside from the sexual abuse allegations, help for his anger control issues. (T. at 136). As to reunification, Dr. Wolfgang testified that reunification was unimaginable if there was any credence to what the children reported. (T. at 137). Even setting the sexual behaviors aside, Dr. Wolfgang found there were a number of issues for Appellant-Father that would significantly affect his ability to parent. (*Id.*)

**{¶28}** By Judgment Entry January 5, 2021, the trial court granted the Agency's motion for permanent custody. In said Judgment Entry, the trial court denied the parents'

motion for a 6-month extension, and found, inter alia, that each of the children had been abandoned, that the children could not be placed with either parent within a reasonable time, that the children were in need of a legally secure placement, and that granting permanent custody to the Agency was in the best interests of the children.

**{¶29}** Appellant-Father now raises the following assignments of error on appeal:

<u>ASSIGNMENTS OF ERROR</u>

**{¶30}** "I. THE TRIAL COURT ERRED BY FINDING THAT THE MINOR CHILDREN WERE ABANDONED CHILDREN.

**{¶31}** "II. THE TRIAL COURT ERRED BY FINDING THAT THE BEST INTERESTS OF THE MINOR CHILDREN WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

**I., II.**

**{¶32}** In his two assignments of error, Appellant-Father argues that the trial court erred in determining that the minor children were abandoned and that granting permanent custody to the Agency was not in the best interests of the children. We disagree.

**Requirements for Permanent Custody Awards**

**{¶33}** R.C. §2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

**{¶34}** Following the hearing, R.C. §2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;

(b) the child is abandoned;

(c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a

consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

**{¶35}** Therefore, R.C. §2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. §2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

### Abandonment – R.C. §2151.414(B)(1)(b).

**{¶36}** In the case at bar, the trial court found, by clear and convincing evidence, that Appellant-Father abandoned the children pursuant to R.C. §2151.414(B)(1)(b). Pursuant to R.C. §2151.011(C), a child is "presumed abandoned when the parties of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."

**{¶37}** Upon review, we find that competent, credible evidence supports the trial court's findings.

**{¶38}** Here, the trial court found that Appellant-Father had abandoned the minor children by virtue of her lack of contact and failure to attempt any form of reunification. Appellant-Father refused to cooperate with law enforcement on his case or to work with the Agency towards reunification. Appellant-Father immediately moved out of the state at the beginning of this case, even after being warned that it would hurt his chances of

reunification with his children.  He left the state from October, 2019, through the end of January, 2020, which was longer than 90 days.  He then moved out of the area again after a short time and has had no contact with the children since they were removed in August, 2019.

{¶39}  A trial court's finding of abandonment under R.C. §2151.414(B)(1)(b) will satisfy the first prong of the permanent custody test, independent of a finding under R.C. §2151.414(B)(1)(a) [Parental Placement within a Reasonable Time], allowing the court to move on to the second prong of considering whether the grant of permanent custody to the agency is in the best interest of the child. *In re A.M.,* 5th Dist. Stark No. 2013 CA 00113, 2013-Ohio-4152.

### The Best Interest of the Child

{¶40}  We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Mauzy Children,* 5th Dist. No. 2000CA00244, 2000 WL 1700073 (Nov. 13, 2000), *citing In re Awkal,* 85 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist. 1994).

{¶41}  In determining the best interest of the child at a permanent custody hearing, R.C. §2151.414(D)(1) mandates the trial court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶42}** No one element is given greater weight or heightened significance. *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816.

**{¶43}** A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.

**{¶44}** In the present case, the trial court's decision indicates it considered the best interest factors. The trial court concluded the children's need for legally secure placement

could not be achieved without awarding permanent custody to the Agency. Upon review of the record, it is clear that the record supports the trial court's finding that granting the motion for permanent custody is in the children's best interest.

**{¶45}** The children have been out of the home for approximately 15 months and have all been placed in foster homes. Each of the foster fathers described loving and caring relationships with the children leading to progress in all areas in the children's lives, including gaining social skills, mastering basic tasks of everyday living, improving in learning and education, and being secure enough to disclose additional incidents suffered. Both families indicated an interest in adopting the children and providing a permanent home. Caseworker Heard testified that all three children are having their basic and special needs met on a consistent basis, that the children are bonded to their foster families, that the children are thriving in their care, and that the foster families are willing and capable of providing permanency for the children.

**{¶46}** The GAL and attorney for the children, Deborah Fries, stated that she believed the children had "been traumatized so much that they need closure on this. We think more counseling with – [Inaudible] I have talked with them about that, and they are very clear and adamant they want to stay where they are currently placed with the families they're with. (T. at 334).

**{¶47}** The court also had before the GAL written reports, including the Supplemental Report filed October 13, 2020, which stated that the children want to stay in their "forever" homes and do not wish to be reunited with their biological parents. The GAL recommended permanent custody be granted to the Agency because the children

could not be safely reunited with the parents and have developed loving bonds in current care.

**{¶48}** The trial court also conducted an in-camera interview with A.P., as well as the psychological evaluations of Appellant-Father and Mother.

## Conclusion

**{¶49}** For these reasons, we find that the trial court's determination that Appellant-Father had abandoned the minor children was based upon competent credible evidence and is not against the manifest weight or sufficiency of the evidence. We further find that the trial court's decision that permanent custody to the Agency was in the children's best interest was based upon competent, credible evidence and is not against the manifest weight or sufficiency of the evidence.

**{¶50}** Appellant-Father's assignments of error I and II are, therefore, overruled.

**{¶51}** Accordingly, the judgment of the Coshocton County Court of Common Pleas, Juvenile Division, terminating Appellant's parental rights and granting permanent custody of Appellant's minor children to Coshocton County Job and Family Services is affirmed.

By: Wise, John, J.
Hoffman, P. J., and
Wise, Earle, J., concur.


JWW/d 0625